**T. P. LABORATORIES, INC., Plaintiff-Appellant,**

v.

**Gerald W. HUGE, Defendant-Appellee.**

**No. 15544.**

United States Court of Appeals
Seventh Circuit.

Nov. 28, 1966.

Lloyd C. Root, Lloyd L. Zickert, Marzall, Johnston, Cook & Root, Chicago, Ill., for appellant.

Allan B. Wheeler, Milwaukee, Wis., for appellee.

Before MAJOR, Senior Circuit Judge, and CASTLE and CUMMINGS, Circuit Judges.

CUMMINGS, Circuit Judge.

This appeal involves the validity of two patents owned by plaintiff. The trial court concluded that the claims in issue were invalid because their subject matter was obvious within the meaning of Section 103 of the Patent Act (35 U.S.C. § 103). The court also concluded that if the patents were valid, defendant had infringed them.

The plaintiff, T. P. Laboratories, Inc., is located in Westville, Indiana, and produces and sells orthodontic appliances and materials. One of its products is a rubber appliance for straightening teeth and is commonly called a tooth positioner. The inventor of this device, Dr. Harold E. Kesling, assigned to plaintiff his rights in patents on this device and on the method of producing it. Dr. Kesling is an officer of the plaintiff corporation. He has specialized as an orthodontist since 1933 and created this tooth positioner in 1943. In the same year he applied for patents on this device and on the method of producing it.[1]

The claims of the method patent application were eventually allowed by the examiner, and a patent on the method was issued to Dr. Kesling in 1949. (No. 2,467,432) The claims of the tooth positioner patent application were rejected by the examiner, but the rejection was reversed by the Board of Patent Appeals, and the positioner patent was issued to Dr. Kesling in 1950. (No. 2,531,222)

The subject matter of the positioner patent is a resilient rubber tooth positioner. This orthodontic appliance is fabricated from a model of the patient's teeth. In the model, the teeth to be

straightened have been cut and replaced in a more desirable position. The positioner contains a rubber partition between the upper and lower impressions. The positioner is placed in the patient's mouth and exerts sufficient force on the teeth to move them to the positions desired by the orthodontist. It is used as the final process in straightening teeth and is worn only part-time by the patient.

The tooth positioner was developed by Dr. Kesling during many hours over a three-year period terminating in 1943, when he first applied for a patent. Dr. Kesling started using his tooth positioner early in 1943, and later that year displayed his device to other orthodontists in New York City. At their request, he made a few tooth positioners for their use. This caused others to be interested, and he started a laboratory to produce this device soon thereafter. Commencing in 1944, he organized seminars on these tooth positioners, giving 25 such seminars in various parts of the country between 1944 and 1956. The evidence shows that plaintiff sold an average of 122 tooth positioners per month in 1954. In 1960, the plaintiff sold an average of 734.

Defendant was employed by plaintiff and its predecessor from 1953 to 1959. He was taught the technique of making these tooth positioners and became very proficient. In late 1959, he became president of the Dental Specialty Company, located in Silver Spring, Maryland, and a year thereafter he founded his own business in Racine, Wisconsin. He aided the Dental Specialty Company in the marketing of a tooth positioner substantially identical to plaintiff's. In his own business, he has been manufacturing and selling such tooth positioners, using plaintiff's method.

In the District Court, the defendant claimed that the patents were invalid for the following reasons: (1) anticipated by the prior art under Section 102 of the Patent Act (35 U.S.C. § 102); (2) in public use more than a year prior to the

---

1. The application for the positioner patent was actually filed in 1946 but was a continuation-in-part of the 1943 parent application.

filing of the applications, as proscribed by Section 102(b) (35 U.S.C. § 102(b)); (3) failure of the patentee to point out particularly and claim distinctly the inventions within Section 102 of the Patent Act (35 U.S.C. § 102); and (4) being obvious and therefore invalid under Section 103 of the Patent Act (35 U.S.C. § 103). The District Court rejected the first three defenses but sustained the fourth one based on obviousness. Since we conclude that these patents were properly invalidated for obviousness, it is unnecessary to consider the remaining defenses. The District Court also held that if the patents were valid, the defendant had infringed them. No appeal has been taken from that conclusion.

Obviousness is governed by Section 103 of the Patent Act providing that a patent may not be obtained "if the differences between the subject matter sought to be patented and the prior art are such that the subject as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art" (35 U.S.C. § 103). This provision was most recently considered by the Supreme Court in Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545. There it was concluded that the Section was merely a codification of judicial precedents (at p. 17, 86 S.Ct. at p. 693). The legislative history showed that Congress did not intend an invention to be patentable "if the difference between the new thing and what was known before is not considered sufficiently great" (at p. 14, 86 S.Ct. at p. 692). The Court described the basic factual inquiries to be made under Section 103 as follows (at p. 17, 86 S.Ct. at p. 694):

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved."

These inquiries were conscientiously made by the court below.

To show the prior art, the defendant relied upon certain previously patented devices and learned articles. The first of these devices is covered by the Sugatt patent that issued in 1900; it is not a Patent Office reference of record in the positioner patent but was cited in the method patent. This patent discloses a rubber appliance to move teeth in a patient's mouth. Its purpose was to straighten teeth. This device is constructed by making an exact duplicate of the patient's teeth and then altering the plaster cast by scraping away a portion of the teeth to be acted upon. A plate of vulcanized rubber is then made from the wax impression of the altered cast. The rubber plate's protruding portion will exert pressure on the tooth to move it after the patient places the plate in his mouth.

The Remensnyder patent issued in 1928. This elastic rubber mouthpiece contains impressions of the patient's teeth as they are at the time the mouthpiece is made. It was not intended to move teeth to new positions but to massage the gums of the wearer. The Remensnyder patent was cited before the Board of Patent Appeals that reversed the examiner's rejection of the positioner patent. This patent was also of record in the prosecution of the method patent.

The Maker patent issued in 1931 and was not cited in either of the patent applications in suit. Maker's patent application described his invention as a "gum massaging device." The device is similar to Remensnyder; both these gum massagers resemble the tooth positioner in question. Plaintiff's expert agreed that if the teeth of the patient using one of these gum massagers drifted out of position, the massager would urge the teeth back to their original position. One of Maker's claims is that his device would tend to correct the abnormality "if any one or more teeth produce incorrect articulation." Maker's massager differs from Remensnyder's by having protrusions on the cups. Maker claimed that if these cups were correctly formed to comply with the patient's "scientifically correct delineation", they would tend to cure dental abnormality.

The final device mentioned by the District Court in connection with prior art was the Gunning interdental splint.[2] To make the Gunning splint, impressions are taken of the patient's teeth, and a cast model is made. At the point of fracture, the model is cut and the parts of the model comprising groups of teeth are adjusted and set to make a proper occlusion, thus moving any dislodged teeth to their normal position. The teeth are not dissected from the model in groups.

Four articles available to orthodontists were also cited to show the prior art. The earliest was Dr. Burgh's 1867 article. Dr. Burgh describes the method he used to move teeth of a patient. He made a cast of the patient's teeth and then scraped away the model teeth to a prudent extent for moving them. The resultant rubber plate had protusions to exert pressure on the teeth.

The next article, published in 1920, describes the Gunning splint to which reference has already been made.

The third article was published in 1926. Its author, Dr. Samuel Herder, suggests making a model of the patient's teeth, employing artificial stone for the teeth. Below the "stone" teeth is one-eighth inch of wax, and the gums and base are of plaster of Paris. The "stone" teeth are moved to normal occlusion by heating the wax. The author found the final model useful in diagnosis and prognosis of malocclusion cases.

The final article considered in connection with the prior art is a 1932 article by Dr. Emil Herbst. Under the Herbst method, a model of the patient's teeth is made, the teeth are cut from the model, and a corrected model is made by moving the teeth on the original model. A new model is then made and a spring of

gold wire is fabricated upon it to exert force on the patient's teeth in order to place them in positions corresponding to those on the corrected model.[3]

■ In concluding that the plaintiff's inventions were obvious within the meaning of Section 103 of the Patent Act (35 U.S.C. § 103), the District Court relied upon the 1867, 1926 and 1932 articles just described. In addition, the District Court relied upon the Sugatt, Remensnyder and Maker patents, issuing between 1900 and 1928, as disclosing devices very similar to the plaintiff's. We agree that the prior art described in those articles and patents was sufficient to sustain the defense of obviousness. As in Graham v. John Deere Co., 383 U.S. 1, at p. 36, 86 S.Ct. 684, at p. 703, Kesling's method and positioner inventions "rest[s] upon exceedingly small and quite non-technical mechanical differences in a device which was old in the art" and are therefore not patentable. They are merely an obvious modification of the prior art.

■■ Plaintiff of course relies upon the presumption of validity that is accorded to patents by virtue of Section 282 of the Patent Code (35 U.S.C. § 282). The presumption of validity of a patent does not exist as against evidence of prior art not before the Patent Office (Hobbs v. Wisconsin Power & Light Co., 250 F.2d 100, 105 (7th Cir. 1957)), certiorari denied, 356 U.S. 932, 78 S.Ct. 774, 2 L.Ed.2d 762, and even one prior art reference not considered by the Patent Office can suffice to overthrow this presumption. Simmons Company v. Hill-Rom Company, 352 F.2d 886, 888 (7th Cir. 1965); Jaybee Manufacturing Corp. v. Ajax Hardware Manufacturing Corp., 287 F.2d 228, 229 (9th Cir. 1961). Here the Maker patent, which differed some-

2. Dr. Gunning, a New York dentist, used such a splint to treat the broken jaw of Secretary of War Seward, who was injured at the time of President Lincoln's assassination. The splint was considered by the District Court only in its discussion of the anticipation defense (35 U.S.C. § 102). However, defendant relied upon the splint in the District Court and here to show obviousness as well.

3. To show prior art, the defendant also relied on several boxer's mouthpiece patents and on other learned articles, but these were not discussed in the trial court's opinion. They are no more pertinent than the devices and articles relied upon by the District Court and therefore need not be discussed here.

what from Remensnyder, was not cited and one of its purposes was to correct dental articulation. The Sugatt patent was not cited in the positioner patent application. Only Remensnyder was cited during the Patent Office proceedings on both patents. The positioner patent had been rejected by the examiner, and Remensnyder was the sole reference on appeal to the Board of Patent Appeals that reversed the examiner. As the trial court noted, even though both Sugatt and Remensnyder were of record in the prosecution of the method patent, the teaching found in Dr. Herder's 1926 article was not before the Patent Office, so that the examiner, who allowed the method patent, was unable to appreciate the significance of Sugatt and Remensnyder. Furthermore, the four key learned articles had evidently not been considered in the Patent Office in connection with Dr. Kesling's claims.

■ Plaintiff asserts that it took Dr. Kesling many hours during three years to develop this tooth positioner but, as Judge Learned Hand pointed out in Picard v. United Aircraft Corporation, 128 F.2d 632, 636 (2nd Cir. 1942), certiorari denied, 317 U.S. 651, 63 S.Ct. 46, 87 L. Ed. 524, "slow but inevitable progress of an industry through trial and error * * [and] persistent and intelligent search for improvement" are insufficient to support a patent. Also, as defendant has noted, if Dr. Kesling had been more familiar with the prior art, much less time would have been needed in developing the positioner.

Plaintiff insists that his device differed from those in the prior art in that it called for dissecting the model teeth and resetting them in wax in the desired position on the model. However, as plaintiff's expert witness, orthodontist Dr. Rogge, testified, this change was merely a variance that would occur to an orthodontist skilled in his art and familiar with the pertinent literature, and his testimony was credited by the trier of facts.

Dr. Rogge used the plaintiff's tooth positioner in his practice. He testified that the resetting factor of plaintiff's device was obvious, because resetting was involved in Herder's 1926 device, Herbst's 1932 device, and in the Gunning splints. He stated that a study of the Herbst article, including its tooth dissection method, and the article on Gunning splints would lead one to the construction of plaintiff's device, and that the 1867 Burgh device and Remensnyder together would also enable a person to make plaintiff's tooth positioner. He pointed out that Remensnyder and Sugatt could be combined to produce the patents in suit. He observed that a Gunning splint would move out-of-position teeth back to a normal position. He considered the Remensnyder and Maker devices to be similar to plaintiff's and noted that the effect of Burgh's device was like Kesling's tooth positioner. He also said that the Maker patent, the boxer mouthpieces,[4] and the learned articles discussed in the trial court's opinion meant that a person with normal skills in orthodontia would be able to practice Dr. Kesling's method. This testimony serves to reinforce the District Court's determination, based on the devices and articles themselves, that plaintiff's patents could not withstand the defense of obviousness.

■ In Zegers v. Zegers, Inc., 365 F. 2d 156 (7th Cir. 1966), certiorari denied, 87 S.Ct. 320, this Court held that providing slots in flanged weather strip to receive the hooks of clips secured to window frames would have been obvious to a person having ordinary skill in the art. Similarly here, we conclude that dissecting these teeth on the model and resetting them to preferred positions under Kesling's method would be obvious to anyone with ordinary skill in orthodontia in the light of the prior art. As pointed out in Zegers, Section 103 of the Patent Act (35 U.S.C. § 103) is to be applied to reward "only genuine contributions to the useful knowledge of an art," so that mere adaptations or manipulations must be denied the grant of a legal monopoly

4. See Note 3, supra.

(365 F.2d at p. 159). Here too, the only differences between Dr. Kesling's device and those described above were adaptations or manipulations of what had been revealed by the prior art.

■ Plaintiff also argues that the longfelt need and commercial success of these patents and the failure of others to produce the inventions earlier demonstrate that the Kesling inventions were not obvious. Such secondary factors may sometimes tip the scales toward patentability,[5] but they have little weight here where "the limited claims of the * * * patent[s] are clearly evident from the prior art as it stood at the time of the invention." Graham v. John Deere Co., 383 U.S. at p. 36, 86 S.Ct. at p. 703; see also 2 Deller's Walker on Patents (2d ed. 1964) § 106, p. 75. At any rate, as in Hobbs v. Wisconsin Power & Light Company, 250 F.2d 100, 105 (7th Cir. 1957), certiorari denied, 356 U.S. 932, 78 S.Ct. 774, 2 L.Ed.2d 762, these objective considerations are "not persuasive or impressive if the record is examined closely." Thus despite plaintiff's claim of longfelt need for tooth positioners, devices similar to plaintiff's that moved teeth to more correct positions had been known as early as 1867 when Dr. Burgh described his positioner. Then came Sugatt's in 1900 and Dr. Herbst's in 1932. These devices also disprove plaintiff's assertion that others had failed to produce satisfactory positioners earlier. There was no proof that other orthodontic devices had been displaced by plaintiff's.

■ With respect to commercial success, the record is devoid of industry-wide statistics. We agree with the District Court's conclusion that the commercial success of this tooth positioner resulted largely from Dr. Kesling's extensive promotional efforts. Success due to a patentee's business ability in exploiting and advertising does not establish patentability. McClain v. Ortmayer, 141 U.S. 419, 428, 12 S.Ct. 76, 35 L.Ed. 800; Morrison v. Coe, 74 App.D.C. 335, 122 F.2d 793, 794 (D.C.Cir. 1941); 2 Deller's Walker on Patents (2d ed. 1964) § 125, p. 321. As Mr. Justice Jackson said in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 153, 71 S.Ct. 127, 130, 95 L.Ed. 162, "commercial success without invention will not make patentability".

Plaintiff cites Amp Incorporated v. Vaco Products Co., 280 F.2d 518 (7th Cir. 1960), certiorari denied, 364 U.S. 921, 81 S.Ct. 286, 5 L.Ed.2d 260, in an effort to avoid Section 103 of the Patent Act, but there the District Court had relied only on one previous patent to show the prior art (at p. 521). Here three earlier patents, the Gunning splint and three articles were discussed in the opinion below in considering prior art. In urging validity, plaintiff also cites McKee Door Company v. Forest Door Company, 284 F.2d 809 (7th Cir. 1960), but McKee had "afforded a remedy for defects in doors of this type and solved the foregoing problems which had confronted the overhead door industry for many years and produced new and beneficial results never before obtained" (at p. 811). In contrast, before Dr. Kesling developed his device, there were other similar devices that straightened or moved teeth. The principal variance between them and this tooth positioner involved the dissecting of teeth from the model and moving them to preselected positions. This was not enough to constitute invention, especially since the idea of dissection and rearrangement of teeth from a model was suggested in Dr. Herbst's 1932 article. Without resort to the expediency of hindsight, Kesling's was only a limited advance obvious to one of ordinary skill in the art.

The judgment of the District Court is affirmed.

5. See Note, "Subtests of 'Nonobviousness'", 112 U.Pa.L.Rev. 1169, 1172, 1175, 1181 (1964). See also 2 Deller's Walker on Patents (2d ed. 1964) § 106, p. 75.